```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


UNITED STATES OF AMERICA                         CRIMINAL ACTION

VERSUS                                           NO. 05-120

TIMOTHY BLAKE DIXON                              SECTION "F"
```

## ORDER AND REASONS

Before the Court is the defendant's Motion to Suppress Confessions. For the reasons that follow, the motion is DENIED.

## Background

This case involves a serious Anthrax scare at the post office in Meraux, Louisiana.

On July 12, 2004, a clear plastic ziplock bag containing a white granular substance was placed on a customer lobby table inside the Meraux Post Office. The chilling message "ANTHRAX, DIE AMERICANS" was written on the outside of the bag in bold black marker print. The Federal Bureau of Investigation Joint Terrorism Task Force (JTTF) was called in to investigate, and the defendant, Timothy Blake Dixon, an 18-year old high school senior, became a suspect.

Dressed in plain clothes (and with no weapons drawn), Task Force Agents Gina Holland and Les Raybon went to Dixon's house to interview him in January 2005.[1]

---

[1] There was insufficient evidence to arrest the defendant at that time. The JTTF had attempted to interview the defendant at

What happened next is in dispute. Cheryl Michel, the defendant's mother, answered the door. She never told them that her son had any special or emotional needs.[2] The agents told her she could not be present for the interview because her son was an adult, but that she could be in a nearby area where she could observe but not participate in the interview.[3] The agents met with Dixon, told them the general purpose of their visit, and -- even though he was not under arrest -- read him his <u>Miranda</u> rights. He said he understood those rights, waived them, and agreed to speak with the agents. The interview was conducted in the living room; it was indeed contentious because Dixon admitted he was nasty to the agents and felt they were low-life. But he confessed to committing the offense. The agents then arrested the defendant.

Shortly thereafter, the agents took him to the local FBI

---

the end of December 2004, but were advised by his mother that he was out of town in Georgia. Shortly after the first attempted interview, as requested, the defendant's mother contacted the JTTF and told them that her son was back in town. The interview took place nearly two weeks later, on January 11, 2005.

[2] Dixon testified. His demeanor was sullen. His language and idiom was that of a mature, determined adult with extremely fixed ideas. Not someone with any special needs or emotional issues, except, perhaps, for his eccentric personal resolve about political and social issues.

[3] The Government says that both the defendant and his mother agreed to this arrangement. The defendant disputes this. As the Government correctly notes, Dixon is an adult and his mother's presence during the interview was not required. Dixon admitted that after he told the agents he wanted them out, he indeed agreed to be interviewed.

office, where he was placed in an interview room.  Prior to any questioning, the defendant was again read his Miranda rights and given a Miranda rights form by Special Agent Scott Allee, who went tediously over the form with the defendant line by line.  Dixon initialed each line, printed his name on the form, and agreed to waive his rights and to make a statement.  The defendant then repeated his confession, slightly amending the statement he made during the interview.[4]

The defendant admits that his mother allowed the agents into their home, but tells a different story of threats, abuse, and intimidation to coerce the confession and then to force him reiterate it at the FBI office.  His account is not believable.[5]

---

[4] According to the Government, the defendant first stated that the bag and his handwritten threat were intended for a "black" classmate at school named "Cornell" with whom he had had some confrontations at school.  He said he did not write Cornell's name on the bag because he knew it would be considered a hate crime.  Later, at the local FBI office, the defendant said he changed his mind at the post office, deciding he no longer wanted to scare Cornell.  Instead, he wanted to feel important, though he did not want anyone to get hurt, he said "someone had to pay and [he] wanted to have some fun and scare people."

[5] The defendant's mother's testimony was disjointed and rather incoherent; she was unable to differentiate between the timing of events she claimed involved coercion.  She claimed to have called a lawyer and spoke with a lady in the office. A lady who was never called as a witness or identified.  The defendant and his mother were in conflict themselves about whether the mother was forced outside or went outside voluntarily while he was interviewed.  Dixon's testimony revealed his own eccentric rage with society.  Moreover, he was well-versed in the law enforcement process because of several juvenile and adult arrests.  He knew about hate crimes.  It is not insignificant that, after he was told of the FBI's interest in him, he did not retain a lawyer even

Moreover, he does not deny that he was twice given his Miranda rights.

The defendant now moves to suppress the both confessions. His motion is denied.

### Law and Application

#### I.

The Fourth Amendment prohibits only unreasonable government intrusions into legitimate expectations of privacy. Carroll v. U.S., 267 U.S. 132 (1925); U.S. v. Chadwick, 433 U.S. 1, 7 (1977). Law enforcement officers may enter a residence where a person with authority to allow entry consents to it. Illinois v. Rodriguez, 497 U.S. 177, 181 (1991); see also Jones v. United States, 357 U.S. 493, 499 (1958). Dixon's mother did so. Dixon saw her do it.

#### A.

The Supreme Court has recently instructed that consent of one resident is not enough to justify the intrusion "over the express refusal of consent by a physically present resident." Georgia v. Randolph, 126 S.Ct. 1526 (2006). Randolph, on its facts, involved entry to search for physical evidence where the estranged wife admitted the police to the marital home to search for drugs, over the express objection of the husband.

The defendant's reliance on Randolph is misplaced. Randolph

---

though he had nearly two weeks to do so before the actual interview. Nor did he request a lawyer when he was advised of his right to do so, not once but twice, by federal agents.

involved a police entry to search for evidence in a shared space, after the police had arrived in response to a domestic dispute. The wife's consent to search for physical evidence was retributive and retaliatory.  Here, Dixon's mother admitted the FBI agents after calling them to tell them that her son had returned home from Georgia.  Even assuming a 19-year old who shares a home with his parent is a co-tenant and, even if the Court were to credit the defendant's testimony that he told the FBI agents to "get out", which the Court does not do after viewing and listening to all the witnesses, Randolph does not convert the agents' initial entry into a Fourth Amendment violation.  Given the agents' lawful admittance into the home, the defendant's first confession in his living room was not the product of a Fourth Amendment insult.  The fact that the agents suggested to Dixon that an analysis of fingerprints might incriminate him (when in fact they did not because no usable prints had been retrieved) does not change the differentiating retaliatory theme of Randolph.  The agents had by then been lawfully admitted into the home and had read Dixon his rights.[6]

B.

Any questioning of a suspect is lawful, assuming it otherwise satisfies Miranda v. Arizona, 384 U.S. 436 (1966) and is voluntary. See generally United States v. Shabazz, 883 F.Supp. 422, 426-427

---

[6] Moreover, common sense seems to suggest that Dixon's claim of innocence would have driven him not to fear a fingerprint analysis of the bag and its potentially ominous contents.

5

(D.Minn. 1995). An interrogation is considered "custodial" generally when a police officer has initiated questioning after a defendant has been deprived of his freedom of action in a significant manner. Miranda, 384 U.S. at 444. A trial court must look at the totality of the circumstances to determine whether a person is "in custody." United States v. Sutera, 933 F.2d 641, 646 (8th Cir. 1991); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); see also California v. Beheler, 463 U.S. 1121, 1125 (1983). Some factors to be considered in applying this analysis, among others, are the location of the interrogation (the home), United States v. Brown, 7 F.3d 1155, 1164 (5th Cir. 1993); the purpose and the length of questioning (a half hour to an hour), and whether the defendant was informed that he was under arrest. United States v. Sutera, 933 F.2d at 646; United States v. Helmel, 769 F.2d at 1320.[7]

Courts consistently have held that Miranda warnings are not required during interrogations conducted at the suspect's residence because the defendant is not considered "in custody." See e.g. United States v. Douglas, 82 F.3d 1315, 1325-1326 (5th Cir. 1996); United States v. White, 270 F.3d 356, 366 (6th Cir. 2001); United States v. Czichary, 378 F.3d 822, 826 (8th Cir. 2004); United States

---

[7] In Helmel, the defendant was interviewed at his home by Internal Revenue Agents. He was told that he was not under arrest but was questioned for approximately two hours. Under such circumstances, the Eighth Circuit found that the defendant was not "in custody" for the purpose of Miranda. Id.

v. Rith, 164 F.3d 1323, 1332 (10th Cir. 1999).  The test is an objective one and the defining inquiry is "how a reasonable person in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984).  The defendant has the burden of persuasion in establishing the custody issue. United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984).

Here, Dixon was questioned in the living room of his home; he was familiar with his surroundings.  See Beckwith v. United States, 425 U.S. 341, 345-47 (1976).[8]  A reasonable person in Dixon's position would have understood his circumstance to be non-custodial.  Under the totality of the circumstances, while the Government contends that the agents did provide Miranda warnings, they were not required in the first instance to even give them to him and, therefore, all subsequent statements are admissible.[9]

---

[8] In Beckwith, the United States Supreme Court found that a defendant who was questioned by the Internal Revenue Service at his home was not in custody for the purposes of Miranda.  Id.  The court made this finding even though they acknowledged that the defendant was probably the focus of a criminal tax investigation. Similarly, United States v. Beheler, 463 U.S. 1121, 1126 (1983), the Supreme Court stated that Miranda warnings are not required simply because no one is a suspect.  Id.  Additionally, the court noted that the length of time between the crime and the interrogation has no relevancy.  Id.

[9] As to whether the defendant voluntarily made the statements at issue, it is the Government's burden to prove voluntariness by a preponderance of the evidence.  Lego v. Twoney, 404 U.S. 477, 489 (1972).  The standard for making such a judgment is whether, in light of the totality of the circumstances, a confession was voluntary or involuntary, because of improper pressures which overbore the will of the defendant.  Haynes v. Washington, 373 U.S. 503, 513-14 (1963).  The agents' testimony at

Thus, absent involuntariness and coercion (of which there is no credible evidence), the defendant's confession at his home is admissible.

## II.

The defendant further contends that the custodial statement at the FBI office was the fruit of his initial unlawfully coerced statement at his home shortly before his arrest and is, therefore, equally inadmissible.  Because the Court has found no Fourth or Fifth Amendment violation respecting the defendant's first statement, the Court must determine whether the second confession obtained, independently, violated the Fifth Amendment.  The Court finds no Fifth Amendment violation:  the defendant voluntarily signed a <u>Miranda</u> waiver form and confessed still a second time to the FBI agents.

Accordingly, defendant's Motion to Suppress is DENIED.

New Orleans, Louisiana, July 20, 2006.

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

the hearing convinces the Court that both of the defendant's statements were voluntary.  Dixon's testimony to the contrary is incredible.

8